Case No. 16-1732

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

**CALL HENRY, INC.,**
Plaintiff-Appellant,

vs.

**UNITED STATES,**
Defendant-Appellee.

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS
Case No.: 1:14-cv-989-MMS
JUDGE LOREN A. SMITH

# CALL HENRY, INC.'S INITIAL BRIEF

BRIAN KOJI
bkoji@anblaw.com

**ALLEN NORTON & BLUE, P.A.**
324 S. Hyde Park Ave., Suite 225
Tampa, Florida 33606
Tel: (813) 251-1210
Attorney for Plaintiff-Appellant

June 24, 2016

# CERTIFICATE OF INTEREST

Counsel for the Appellant, Call Henry, Inc., certifies the following:

1. The full name of every party or amicus represented by me is:

   **Call Henry, Inc.**

2. The name of the real party in interest represented by me is:

   **Call Henry, Inc.**

3. All parent corporations and any publicly held companies that own 10 percent of the stock of the party or amicus curiae represented by me are listed below.

   **None.**

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (and who have not or will not enter an appearance in this care) are:

   **None.**

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF CONTENTS ........ ii

TABLE OF CITATIONS ........ v

STATEMENT OF RELATED CASES ........ 1

STATEMENT OF JURISDICTION ........ 1

STATEMENT OF THE ISSUE ........ 1

STATEMENT OF THE CASE ........ 2

I. Nature of the Case, the Course of Proceedings, and Disposition in the Court of Federal Claims ........ 2

II. Statement of the Facts ........ 3

A. Call Henry is awarded the NASA contract, which, in accordance with the Service Contract Act, obligates CHI to provide specified pension benefits. ........ 3

B. The pension benefits required by the Service Contract Act and by the solicitation are the pension benefits set forth in the Teamsters Local 416 Pension Plan. ........ 5

C. NASA mandates that CHI price the contract using the costs of providing the pension benefits established by the 2003-2007 Teamsters collective bargaining agreement, while specifically prohibiting CHI from including any contingencies for increased pension costs in its pricing. ........ 6

D. Pursuant to the 2003-2007 Teamsters collective bargaining agreement, CHI becomes a participating employer in the Teamsters Local 416 Pension Plan in 2003 and becomes obligated to provide the specific pension benefits of that plan. ........ 9

E. Although prohibiting CHI from pricing contingencies for future increases in its pension costs, the contract incorporates the price adjustment clause to provide for such increases. ........ 10

F. CHI and the Teamsters negotiate subsequent collective bargaining agreements for 2008-2011 and 2012-2016, which become successor wage determinations applicable to the NASA contract. ....... 11

G. The Teamsters Pension Plan's funding reaches "critical status" in 2008, requiring the plan to scale back benefits and the participating employers to increase pension contributions to fund the required pension benefits. ....... 13

H. In 2012, CHI's employees vote to decertify the Teamsters as their union representative, triggering the Teamsters Pension Plan to force CHI out of the plan. ....... 14

I. CHI submits a certified claim to NASA seeking reimbursement of its increased pension costs, which NASA denies ....... 15

III. The Decision of the Court of Federal Claims ....... 15

SUMMARY OF THE ARGUMENT ....... 17

ARGUMENT ....... 18

I. The applicable standard of review is *de novo*. ....... 18

II. CHI's contract with NASA requires NASA to provide a price adjustment for increases CHI experienced in providing legally-required pension benefits, including the pension withdrawal liability cost. ....... 20

A. The price adjustment clause required NASA to reimburse CHI for its increased pension costs, including associated withdrawal liability, because such costs were required to provide the pension benefits mandated by the Service Contract Act. ....... 21

B. Pension withdraw liability constitutes the cost of providing the employer's portion of employee pension benefits which accrued prior to the employer's withdrawal. ....... 27

C. By prohibiting CHI from including contingencies to cover unanticipated future pension cost increases, while also denying CHI reimbursement when such increases

arise, NASA has denied CHI the very benefit for which the price adjustment clause was included in the contract. ........31

CONCLUSION ........................................................................................34

**ADDENDUM**

Judgment ........................................................................................ Appx 1

Opinion and Order ........................................................................ Appx 2

# TABLE OF CITATIONS

## CASES

*Ainslie v. United States*, 355 F.3d 1371 (Fed. Cir. 2004) ....................................... 19

*Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) ............ 19

*Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597 (2014) ............................ 20

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) ........................................................................................ 19

*Bell/Heery v. United States*, 739 F.3d 1324 (Fed. Cir. 2014) ................................. 18

*Boyle v. United States*, 200 F.3d 1369 (Fed. Cir.2000) .......................................... 19

*Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602 (1993) ....................... 28

*Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986) .............................................................................. 28

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir.1999) ......................................................................... 19

*Kane v. United States*, 43 F.3d 1446 (Fed. Cir.1994) .............................................. 19

*Lear Siegler Services, Inc. v. Rumsfeld*, 457 F.3d 1262 (Fed. Cir. 2006) ....... passim

*Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S. Ct. 2709, 81 L. Ed. 2d 601 (1984) ....................................................... 28

*San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957 (Fed. Cir. 1989) ............................................................................... 20

*Sommers Oil Co. v. United States*, 241 F.3d 1375 (Fed. Cir. 2001) ........................ 18

*Southfork Sys., Inc. v. United States*, 141 F.3d 1124 (Fed. Cir.1998) ..................... 19

*Trinity Servs., Inc. v. Marshall*, 593 F.2d 1250 (D.C. Cir. 1978) ............................ 16

*Vargas v. United States*, 114 Fed. Cl. 226 (2014) .................................................. 18

*Xechem Int'l, Inc. v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 382 F.3d 1324 (Fed. Cir. 2004) ......................................................................... 19

*Young v. AGB Corp.*, 152 F.3d 1377 (Fed. Cir.1998) ............................................ 19

**STATUTES**

28 U.S.C. § 1295 ........................................ 1
28 U.S.C. § 1491 ........................................ 1
29 U.S.C. § 1132 ........................................ 30
29 U.S.C. § 1145 ........................................ 30
29 U.S.C. § 1381 ........................................ 15, 28
29 U.S.C. § 1391 ........................................ 28
29 U.S.C. §1381 ........................................ 15
41 U.S.C. § 6701 ........................................ 4
41 U.S.C. § 6703 ........................................ 23
41 U.S.C. § 6707 ........................................ 4, 23
41 U.S.C. § 7104 ........................................ 1

**RULES**

Fed. Cir. R. 47.5 ........................................ 1
RCFC 12(b)(6) ........................................ 3, 19

**REGULATIONS**

29 C.F.R. § 4.163 ........................................ 12, 23
29 C.F.R. § 4.50 ........................................ 22
29 C.F.R. § 4.53 ........................................ 23
48 C.F.R. § 1852.231-71 (Mar. 1994) ........................................ 8
48 C.F.R. § 22.1002-3 ........................................ 23
48 C.F.R. § 52.222-41 (May 1989) ........................................ 4, 5, 22
48 C.F.R. § 52.222-43 ........................................ 9, 24, 25
48 C.F.R. § 52.222-44 (Feb. 2002) ........................................ passim

**OTHER AUTHORITIES**

Executive Order 13706 ......................................................................................30

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for Call Henry, Inc., represents that there have not been any other appeals from the same civil action or proceeding before this or any other appellate court. Counsel for Call Henry is not aware of any cases pending in this or any other court that will directly affect, or be directly affected by, this Court's decision in the pending appeal.

## STATEMENT OF JURISDICTION

Jurisdiction over Call Henry's breach of contract claim before the United States Court of Federal Claims was proper pursuant to the Contract Disputes Act of 1978, 41 U.S.C. § 7104(b), and 28 U.S.C. § 1491(a).

Jurisdiction from the Final Judgment of the Court of Federal Claims, dated February 22, 2016, granting the Defendant's Motion to Dismiss is proper pursuant to 28 U.S.C. § 1295(a)(3).

## STATEMENT OF THE ISSUE

The issue presented for review in this case is whether the Court of Federal Claims erred by dismissing Call Henry's claim for breach of the price adjustment clause of its contract with NASA, where NASA denied CHI's price adjustment seeking reimbursement of its increased costs incurred to provide pension benefits mandated by the Service Contract Act.

As detailed below, Call Henry contends that NASA was required by the parties' contract to provide a price adjustment reimbursing it for increased costs incurred to provide pension benefits mandated by the Service Contract Act. NASA's unwillingness to provide such reimbursement constitutes a breach of its contract with Call Henry.

## STATEMENT OF THE CASE

### I. NATURE OF THE CASE, THE COURSE OF PROCEEDINGS, AND DISPOSITION IN THE COURT OF FEDERAL CLAIMS

Call Henry ("CHI") and the United States – namely, the National Aeronautics and Space Administration, John H. Glenn Research Center ("NASA") -- were parties to a government contract covered by the Service Contract Act. (Appx17-18).

CHI filed its Complaint against the United States on October 15, 2015. (Appx17-56). In its Complaint, CHI sought a judgment against the government in the amount of $1,686,646 for increased pension costs which CHI was required by the government to pay and for which the government refused to provide a price adjustment, in breach of the parties' contract. (Appx17, 25). In its Complaint, CHI also sought an additional $196,942.26 in related legal and actuarial fees incurred by CHI as part of its efforts to successfully reduce the increased pension costs at issue from an initial amount of $6.6 million to the final amount of $1,686,646.

The government filed a motion to dismiss CHI's Complaint pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims, to which CHI responded. (DE 8, 11). Following additional briefing requested by the Court,[1] the Court of Federal Claims granted the government's motion and dismissed CHI's complaint with prejudice, subsequently entering final judgment on February 22, 2016. (Appx1-10).

CHI contends that the Court of Federal Claims erroneously dismissed its claim for breach of contract and, accordingly, this appeal followed.

## II. Statement of the Facts

### A. Call Henry is awarded the NASA contract, which, in accordance with the Service Contract Act, obligates CHI to provide specified pension benefits.

As pled in the Complaint, CHI and NASA were parties to NASA Contract No. NNC07BA04B, a facilities and maintenance contract with a three-year base period and seven subsequent option years.[2] (Appx17, Complaint, ¶¶ 5, 8; Appx74-

---

[1] The initial judge assigned to the case requested, *sua sponte*, briefing by the parties on an alternative theory of liability. (Appx11-13). In essence, the judge sought clarification as to whether the government could be liable for pension withdrawal liability as an "employer" of CHI's employees. (Appx11-13). The case was subsequently reassigned to Senior Judge Loren A. Smith, who determined that NASA was not an employer for purposes of this liability. (Appx8-9). CHI is not contesting that determination in this appeal. Rather, as detailed below, CHI contends that reimbursement of its increased pension costs was required by the price adjustment clause in the parties' contract.

[2] The contract was previously designated as Contract No. NAS3-03003.

75, 81-82, Contract, §§ F.2, F.3, G.8). CHI began performance of the contract in June 2003. (Appx18, Complaint, ¶ 5).

The contract constituted a service contract governed by the Service Contract Act, 41 U.S.C. §§ 6701-6707, and its implementing regulations. (Appx17-18, Complaint, ¶ 6). As such, FAR 52.222-41 (May 1989) (Service Contract Act of 1965, as amended), was expressly incorporated into the contract. (Appx92-93, Contract, § I.1). That clause required that CHI pay each service employee performing work under the government contract "not less than the minimum monetary wages and … fringe benefits in accordance with the wages and fringe benefits determined by the Secretary of Labor, or authorized representative, as specified in any wage determination attached to this contract." FAR 52.222-41(c) (May 1989).

The Service Contract Act clause further provides that, "[i]f this contract succeeds a contract subject to the Act under which substantially the same services were furnished in the same locality and service employees were paid wages and fringe benefits provided for in a collective bargaining agreement, … neither the Contractor nor any subcontractor under this contract shall pay any service employee performing any of the contract work … less than the wages and fringe benefits provided for in such collective bargaining agreement, to which such employee would have been entitled if employed under the predecessor contract,

including accrued wages and fringe benefits provided for under such agreement." FAR 52.222-41(f).

### B. The pension benefits required by the Service Contract Act and by the solicitation are the pension benefits set forth in the Teamsters Local 416 Pension Plan.

As required by the Service Contract Act, the NASA contract at issue in this case incorporated a wage determination setting forth the minimum required wages and fringe benefits CHI was required to pay its employees. Specifically, the contract incorporated a Teamsters Local 416 collective bargaining agreement as the relevant wage determination.[3] (Appx18-19, Complaint, ¶¶ 10-13). The NASA contract provided:

> With reference to Paragraph (c) of the clause entitled "Service Contract Act of 1965", the U.S. Department of Labor has not yet made a Wage Determination. It will either be incorporated at a later date, or in the absence of its incorporation, all economic provisions, including prospective increases, of the current Collective Bargaining Agreements (Attachments J-H6.1 and J-H6.2) and the provisions of paragraph (e) of said clause ("Minimum Wage") shall apply.[4]

(Appx89, Contract, § H.6).

---

[3] The contract also incorporated a collective bargaining agreement with the International Brotherhood of Electrical Workers, which set forth the applicable wages and fringe benefits for other CHI employees. The IBEW agreement is not an issue in this case.

[4] Clause J-1 of the contract further provided that Attachment J-H6.1 (Teamsters Local 416 Collective Bargaining Agreement) is "attached at the end of solicitation/contract and made a part hereof[.]" (Appx96, Contract, § J-1).

The 2003-2007 Teamsters collective bargaining agreement became effective on January 1, 2003 and applies solely to employees employed to provide services to NASA under the government contract at issue (and its predecessor government contract). (Appx472-474).

With respect to the minimum pension obligations mandated by the Service Contract Act, the 2003-2007 collective bargaining agreement required CHI:

> [T]o pay into the Teamsters Local 416's Pension Fund, located at 709 Brookpark Road, Cleveland, Ohio 44109, the agreed amount during the term of this Agreement, for all hours for which said employee received pay, but not to exceed a total of forty (40) hours per week …
>
> The agreed payment set forth by the Employer shall be used by the Pension Fund to provide retirement benefits for eligible employees in accordance with the pension plan of the Fund as determined by the Trustees of the Pension Fund. The Employer agrees to become a party to the Agreement and Declaration of Trust establishing said Teamsters Local 416 of Cleveland, Ohio Pension Fund; and to be bound by all of the terms and provisions thereof; …
>
> Contributions to the Pension Fund must be made for each month on each eligible employee. Company contributions to the Pension Fund will in no way be distributed as wages.
>
> The Company will contribute to the Local 416 Pension Fund as follows:
>
> The Company will contribute ninety cents (0.90) per hour each year, up to forty (40) hours per week, commencing January 1, 2003 for the life of this Agreement.

(Appx28, 484).

### C. NASA mandates that CHI price the contract using the costs of providing the pension benefits established by the 2003-2007

> **Teamsters collective bargaining agreement, while specifically prohibiting CHI from including any contingencies for increased pension costs in its pricing.**

Importantly, since the 2003-2007 Teamsters collective bargaining agreement was incorporated into the NASA Contract as the relevant Service Contract Act wage determination, CHI priced the contract using the wages and fringe benefit costs (including pension costs) set forth in the 2003-2007 Teamsters collective bargaining agreement. (Appx61-70). The Defendant was well aware that the cost of the pension benefit was included in CHI's pricing, not only because the solicitation and contract specifically incorporated the 2003-2007 collective bargaining agreement, but also because the solicitation specifically required CHI to include the fringe benefit costs and further advised that the bid would be subject to review for compliance in that regard.

Indeed, the solicitation specifically required CHI to certify:

> By submission of this offer, in response to this solicitation, the offeror hereby certifies that to the best of the offeror's knowledge, this offer is in conformance with the Department of Labor Wage Determination required by the Service Contract Act of 1965, as amended and applicable to this procurement, that all minimum rates and fringe benefits specified have been considered in the preparation of this offer and that the conformability requirements between designated service employees and other contract personnel have been considered and appropriately reflected in this offer.

(Appx514, Solicitation, § K-9).

Further stressing the importance of pricing the cost of mandated pension benefits, the solicitation also incorporated NASA FAR 1852.231-71 (Mar. 1994) (Determination of Compensation Reasonableness), which provides, in relevant part:

> The proposal shall include a total compensation plan. The plan shall address all proposed labor categories, including those personnel subject to union agreements, the Service Contract Act, and those exempt from both of the above. The total compensation plan shall include the salaries/wages, fringe benefits and leave programs proposed for each of these categories of labor. …
>
> The offeror shall provide written support to demonstrate that its proposed compensation is reasonable.

NASA FAR 1852.231-71(a)-(b) (Mar. 1994) (incorporated into contract solicitation pursuant to Appx515, Solicitation, § L-1(II)).

Significantly, while CHI was required to use the wage and pension costs set forth in the 2003-2007 Teamsters collective bargaining agreement to price its initial prices and hourly rates in the contract, CHI was expressly prohibited by the government from including any allowances in its pricing for contingencies to cover potential future pension cost increases. (Appx18, Complaint ¶ 7; Appx90-91, Contract, §I.1). To this end, FAR 52.222-44(b) (Feb. 2002), which is incorporated into the contract commands, "[t]he Contractor warrants that the prices in this contract do not include any allowance for any contingency to cover increased costs

for which adjustment is provided under this clause."[5] Accordingly, CHI's initial pricing of the contract did not contain any allowances for future increased costs of complying with the Service Contract Act beyond the 2003-2007 collective bargaining agreement.

### D. Pursuant to the 2003-2007 Teamsters collective bargaining agreement, CHI becomes a participating employer in the Teamsters Local 416 Pension Plan in 2003 and becomes obligated to provide the specific pension benefits of that plan.

When CHI began performance of the NASA contract in 2003, it became a party to the 2003-2007 Teamsters Local 416 collective bargaining agreement. (Appx18, Complaint, ¶ 10). That collective bargaining agreement requires CHI "to become a party to the [Teamsters Pension Plan] and to be bound by all of the terms and provisions thereof." (Appx28, 484). CHI's required pension contributions "shall be used by the Pension Fund to provide retirement benefits for eligible employees in accordance with the [Teamsters Pension Plan]." (Appx28, 484). The Teamsters Pension Plan is a multiemployer pension plan maintained and administered by an independent board of trustees on behalf of Teamsters Local 416

[5] The government contends that FAR 52.222-43 should govern this case, rather than FAR 52.222-44. Notwithstanding that FAR 52.222-43 was not incorporated into the contract, that clause contains identical language prohibiting a contractor from pricing contingencies to cover future pension cost increases. See FAR 52.222-43(b).

union members, including CHI employees employed under the NASA contract. (Appx19, Complaint, § 15).

As required by the contract and these collective bargaining agreement provisions, CHI did, in fact, become a participant in the Teamsters Pension Plan and commence providing its employees these pension benefits throughout the period of time covered by the 2003-2007 Teamsters collective bargaining agreement. (Appx484; Appx19-20, 23, Complaint, ¶¶ 12-20, 40).

### E. Although prohibiting CHI from pricing contingencies for future increases in its pension costs, the contract incorporates the price adjustment clause to provide for such increases.

The contract in this case incorporates the price adjustment clause set forth in FAR 52.222-44. (Appx18, Complaint ¶ 7; Appx90-91, Contract, §I.1). That clause provides price adjustments for future wage and fringe benefit cost increases associated with complying with the Service Contract Act. (Appx18, Complaint ¶ 7; Appx90-91, Contract, §I.1). In particular, FAR 52.222-44 provides that "[t]he contract price, contract unit price labor rates, or fixed hourly labor rates will be adjusted to reflect increases or decreases by the Contractor in wages and fringe benefits to the extent that these increases or decreases are made to comply with (1)

an increased or decreased wage determination applied to this contract by operation of law; …”[6] FAR 52.222-44(c) (Feb. 2002).

**F. CHI and the Teamsters negotiate subsequent collective bargaining agreements for 2008-2011 and 2012-2016, which become successor wage determinations applicable to the NASA contract.**

Following expiration of the 2003-2007 Teamsters collective bargaining agreement, the 2008-2011 Teamsters collective bargaining agreement became effective. (Appx20, Complaint, ¶ 18; Appx32-36). As with the 2003-2007 agreement, the 2008-2011 agreement also obligated CHI to participate in the Teamsters Local 416 Pension Plan and to provide covered employees the pension benefits set forth in that Plan. (Appx32-36). The 2008-2011 collective bargaining agreement also increased the hourly pension contribution from $2.00 to $2.60 per hour per employee.[7] (Appx34).

By operation of law, the 2008-2011 collective bargaining agreement became the applicable wage determination under the Service Contract Act as of June 2008, when the government contract option for that year was exercised. (Appx20,

---

[6] Even assuming that FAR 52.222-43 applies in lieu of FAR 52.222-44, the outcome in this case does not change. To that end, as with FAR 52.222-44, FAR 52.222-43 requires a price adjustment for any increased costs of providing fringe benefits such as the pension benefits at issue in this case.

[7] Hourly pension contributions for two specified employees were raised to $3.10 per hour. (Appx34).

Complaint, ¶ 20).[8] As required by FAR 52.222-44, the government reimbursed CHI by providing a price adjustment for its increased costs associated with the increased pension contributions from $2.00 per hour to $2.60 per hour under the 2008-2011 collective bargaining agreement. (Appx21, Complaint, ¶ 24).

Following expiration of the 2008-2011 Teamsters collective bargaining agreement, the 2012-2016 collective bargaining agreement became effective on January 1, 2012. (Appx20, Complaint, ¶ 19; Appx 37-40). As with the 2003-2007 and 2008-2011 agreements, the 2012-2016 Teamsters collective bargaining agreement obligated CHI to participate in the Teamsters Local 416 Pension Plan and to provide covered employees the pension benefits set forth in that Plan. (Appx20, Complaint, ¶ 19; Appx38-39). The 2012-2016 collective bargaining agreement increased the hourly pension contribution by 23.1% per hour for each year of the agreement. (Appx38-39).

As required by the Service Contract Act, NASA specifically incorporated the 2012-2016 Teamsters collective bargaining agreement into the contract, effective January 1, 2012. (Appx431). In this regard, Modification 57 provided:

> This Modification is written to incorporate the new Collective Bargaining Agreement (CBA) between Call Henry, Inc. and Teamsters Local 416 and the resultant wage rates and fringe benefits effective under this new agreement.

---

[8] *See also* 29 C.F.R. § 4.163(b), (e).

> The new CBA is effective January 1st, 2012 to December 31st, 2016 which supersedes the previous agreement and its fringe benefits and rates.

(Appx431).

Accordingly, the 2012-2016 Teamsters collective bargaining agreement became the applicable wage determination under the Service Contract Act as of January 1, 2012. (Appx431; Appx20, Complaint, ¶ 20). As with the prior hourly pension contribution increase originating from the 2008-2011 collective bargaining agreement, the government provided a price adjustment and reimbursed CHI for its increased pension costs associated with the 23.1% increase in hourly pension contributions as of January 1, 2012. (Appx21, Complaint, ¶ 24).

### G. The Teamsters Pension Plan's funding reaches "critical status" in 2008, requiring the plan to scale back benefits and the participating employers to increase pension contributions to fund the required pension benefits.

For the plan year beginning on October 1, 2008, the trustees of the Teamsters Pension Plan advised CHI that the plan's funding had reached "critical status" as defined by the terms of the Pension Protection Act of 2006, Pub. L. 109-280 (Aug. 17, 2006). (Appx20, Complaint, ¶ 21). Critical status under the Pension Protection Act required the plan's board of trustees to adopt a Rehabilitation Plan scaling back certain benefits and mandating increased pension contributions from all participating employers, CHI included. (Appx21, Complaint, ¶¶ 22-23). The 23.1% per hour increase in CHI's pension contribution was included as part of the

2012-2016 Teamsters collective bargaining agreement. (Appx21, Complaint, ¶ 23; Appx38-39). Indeed, that collective bargaining agreement expressly provided that the Pension Plan's Rehabilitation Plan and pension contribution increases were being included within the collective bargaining agreement due to the Pension Protection Act. (Appx39-40).

Throughout CHI's participation in the Teamsters Pension Plan, the government has reimbursed CHI for the hourly pension contributions paid by it to provide the benefits set forth in the Teamsters Pension Plan, including those required by the Rehabilitation Plan. (Appx21, Complaint, ¶ 24).

### H. In 2012, CHI's employees vote to decertify the Teamsters as their union representative, triggering the Teamsters Pension Plan to force CHI out of the plan.

On May 7, 2012, CHI employees voted to oust the Teamsters as their certified labor representative. (Appx21, Complaint, ¶ 26). As a consequence, the Teamsters Local 416 Pension Plan advised CHI that it was no longer permitted to participate in the Pension Plan and that it therefore deemed CHI to have withdrawn from the Pension Plan as of May 7, 2012. (Appx, 22, Complaint, ¶ 28).

As a consequence of being forced to withdraw from the Teamsters Pension Plan, CHI was advised by the Plan that it was being assessed withdrawal liability to fund its portion of the pension benefits which had already accrued prior to withdrawal. (Appx22, Complaint, ¶ 30). The amount of withdrawal liability

assessed against CHI to pay for these pension benefits totaled $1,686,646.[9] (Appx22-23, Complaint, ¶¶ 30-35). Pursuant to the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §1381 *et seq*. ("MPPAA"), CHI has been making quarterly payments toward this withdrawal liability in the amount of $134,754 since August 2012 and continuing to this day.

### I. CHI submits a certified claim to NASA seeking reimbursement of its increased pension costs, which NASA denies.

CHI timely submitted a certified claim to NASA seeking a price adjustment in the nature of reimbursement of the withdrawal liability associated with providing the pension benefits required by the contract in this case. (Appx35-36, Complaint, ¶¶ 35-36; Appx43-52). Be letter dated September 11, 2014, NASA denied CHI's claim, and CHI instituted the present suit for breach of contract. (Appx22, Complaint, ¶¶ 37-46; Appx53-56).

## III. THE DECISION OF THE COURT OF FEDERAL CLAIMS

The Court of Federal Claims dismissed CHI's breach of contract claims with prejudice by order dated February 17, 2016, and a subsequent final judgment dated February 22, 2016. (Appx1-10).

---

[9] The Pension Plan initially advised CHI that the withdrawal liability would amount to over $6.6 million, but CHI was able to reduce that amount to $1,686,646 after successfully challenging the plan's liability calculations at arbitration. (Appx22, Complaint, ¶¶ 30-35).

In its decision, the Court agreed with CHI that the NASA contract at issue specifically "incorporated both a price adjustment clause and wage determination clause[.]" (Appx6). The Court further held that "the previously mentioned contractual provisions suggest that the Service Contract Act requires successor contractors to provide the same economic provisions of either Department of Labor wage determinations or existing collective bargaining agreements." (Appx6) (citing *Trinity Servs., Inc. v. Marshall*, 593 F.2d 1250, 1257-58 (D.C. Cir. 1978)). The Court also correctly noted that the Service Contract Act incorporates only the wage and fringe benefit provisions of the relevant collective bargaining agreement. (Appx6).

Accordingly, the Court unambiguously and correctly held that "there exists a contractual requirement that defendant reimburse claimant for contributions to **and costs associated with** the pension plan[.]" (Appx6) (emphasis added). Notwithstanding, the Court concluded that pension withdrawal liability is not a cost associated with the pension plan, such that this contractual requirement "does not extend to withdrawal liability." (Appx6). In the Court's view, "[w]ithdrawal liability is not a fringe benefit … but a distinct statutory debt imposed by the MPPAA." (Appx7).

## SUMMARY OF THE ARGUMENT

In this appeal, CHI contends that the trial Court's determination that pension withdrawal liability, which is a specific cost whose purpose is to fund the pension obligations accrued under the terms of the collective bargaining agreement, is indeed a cost associated with the pension plan, and, as such, a price adjustment to reimburse for those increased costs is required.

The fact that the payment of withdrawal liability is also statutorily mandated, while correct, is not dispositive. The relevant issue is whether withdrawal liability is a cost of providing a fringe benefit required by the Service Contract Act. The can be no question that the pension benefits contained in the Teamsters Pension Plan, and mandated by the Teamsters collective bargaining agreement, are fringe benefits that, as the trial Court determined, were contractually and statutorily required. While the cost of withdrawal liability itself is not the fringe benefit, neither is the hourly pension contributions paid by CHI (and which were reimbursed by NASA). Both the cost of the hourly contributions and the withdrawal liability are *the costs of providing* the fringe benefit. It's the pension benefits themselves that are the fringe benefits mandated by the Service Contract Act.

The hourly pension contributions paid by CHI and the withdrawal liability paid by CHI both serve the exact same function – to pay for the cost of the pension

benefits mandated by the Service Contract Act. Indeed, had CHI remained in the pension plan, no withdrawal liability would have been assessed, but these same costs for funding the accrued pension benefits would have been paid by CHI (and reimbursed by the government) as part of its hourly pension contributions. In this respect, when the pension contribution rose in 2012 by 23.1%, the government correctly granted a price adjustment and reimbursed for those costs. The costs of funding those same pension benefits, via withdrawal liability after CHI was involuntarily forced to withdraw from the Pension Plan, should likewise have been reimbursed. NASA refusal to do so constitutes a breach of the price adjustment clause in the parties' contract.

# ARGUMENT

## I. THE APPLICABLE STANDARD OF REVIEW IS *DE NOVO*.

This Court uses a *de novo* standard of review when assessing the correctness of the trial court's grant of a motion to dismiss. *Bell/Heery v. United States*, 739 F.3d 1324, 1330 (Fed. Cir. 2014). In so doing, this Court employs the same legal standard used by the Court of Federal Claims. *Id*. More particularly, the Court is obligated to accept as true the Complaint's factual allegations and to construe them in the light most favorable to CHI. *Sommers Oil Co. v. United States*, 241 F.3d 1375, 1378 (Fed. Cir. 2001); *Vargas v. United States*, 114 Fed. Cl. 226, 222 (2014). Accepting the Complaint's factual allegations as true and construing all

reasonable inferences in the light most favorable to CHI, if the Complaint states a claim to relief that is plausible on its face, the motion to dismiss must be denied. *Bell/Heery*, 739 F.3d at 1330 (citing *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) and *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

Additionally, "[d]ismissal under Rule 12(b)(6) receives plenary appellate review." *Xechem Int'l, Inc. v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 382 F.3d 1324, 1326 (Fed. Cir. 2004) (citing *Boyle v. United States,* 200 F.3d 1369, 1371 (Fed. Cir.2000); *Young v. AGB Corp.*, 152 F.3d 1377, 1379 (Fed. Cir.1998)). Where, as here, the trial court's decision is based on a determination involving a question of law, *de novo* review of that determination is warranted. *Ainslie v. United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004) (citing *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1286–87 (Fed. Cir.1999); *Kane v. United States,* 43 F.3d 1446, 1448 (Fed. Cir.1994)).

Applying these principles, "[a] court may dismiss for failure to state a claim upon which relief may be granted only when it is beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *First Hartford Corp. Pension Plan & Trust*, 194 F.3d at 1287 (citing *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1131 (Fed. Cir.1998)).

In the present case, the facts pled by CHI in its Complaint entitle CHI to a price adjustment for the increases it experienced in providing the mandated pension benefits under the Service Contract Act, including the increased pension costs that took the form of withdrawal liability. NASA's failure to provide the price adjustment constituted a breach of contract and, as such, the Complaint states a valid claim upon which relief can be granted.

## II. CHI'S CONTRACT WITH NASA REQUIRES NASA TO PROVIDE A PRICE ADJUSTMENT FOR INCREASES CHI EXPERIENCED IN PROVIDING LEGALLY-REQUIRED PENSION BENEFITS, INCLUDING THE PENSION WITHDRAWAL LIABILITY COST.

The issue in this appeal is whether CHI's Complaint stated a viable claim for breach of the price adjustment clause in the parties' contract. CHI contends that a price adjustment reimbursing CHI for the pension withdrawal liability was contractually required and NASA's refusal to provide such reimbursement constituted a breach.

To plead a viable claim for breach of contract, a plaintiff must allege (1) a valid contract between the parties, (2) an obligation or duty arising out of the contract, (3) breach of that duty, and (4) damages caused by the breach. *Barlow & Haun, Inc. v. United States*, 118 Fed. Cl. 597, 620 (2014) (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989)). In the present dispute, there is no question that CHI and the government were parties to a valid contract, that the contract contained a priced adjustment clause,

that CHI's request for a price adjustment was denied by the government, and that CHI has suffered in excess of $1.6 million in damages as a result. Accordingly, the only issue in this case is whether the contractual price adjustment clause obligates the government to provide a price adjustment under the circumstances presented in this case. CHI contends that it does.

### A. The price adjustment clause required NASA to reimburse CHI for its increased pension costs, including associated withdrawal liability, because such costs were required to provide the pension benefits mandated by the Service Contract Act.

Under the facts pled by CHI in its Complaint, CHI was obligated by the Service Contract Act and by the NASA contract to provide the specific pension benefits set forth in the Teamsters Pension Plan. In this respect, the pension provisions of the Teamsters collective bargaining agreements were incorporated as the applicable wage determinations for the NASA contract. The collective bargaining agreement specifically required that CHI become a participating employer in the Teamsters Pension Plan, agree to all the terms of that Pension Plan's governing terms, and to make payments to the Pension Plan for the express purpose of "provid[ing] retirement benefits for eligible employees in accordance with the pension plan of the Fund as determined by the Trustees of the Pension Fund." (Appx28, 32-40).

Under the Service Contract Act, wage determinations based on a collective bargaining agreement is defined as "[d]eterminations that set forth the wage rates

and benefits, including the accrued and prospective increases, contained in a collective bargaining agreement applicable to the service employees who performed on a predecessor contract in the same locality." 29 C.F.R. § 4.50(b). Accordingly, the Service Contract Act clause, which was incorporated into the NASA contract, provided, "Each service employee employed in the performance of this contract by the Contractor or any subcontractor … shall be furnished fringe benefits in accordance with the wages and fringe benefits determined by the Secretary of Labor, or authorized representative, as specified in any wage determination attached to this contract." FAR 52.222-41(c) (May 1989).

As discussed above, the solicitation in this case specifically required CHI to use the Teamsters collective bargaining agreement as the applicable wage determination for wages and fringe benefits, including pension benefits, when pricing the NASA contract. Notably, while requiring that CHI use the Teamsters collective bargaining agreement as the wage determination in pricing its proposal, the solicitation simultaneously prohibited CHI for including any contingencies in its pricing for potential future increased wage and pension costs since the price adjustment clause was included for that specific purpose.

CHI, as a successor contractor in June 2003 and with each anniversary year and option renewal, was required by the Service Contract Act to pay its employees the wages and fringe benefits specified in the applicable wage determination,

which, in this case is the Teamsters collective bargaining agreements.[10] 29 C.F.R. § 4.53; *see also* 41 U.S.C. § 6707(c) (2013); FAR 22.1002-3. To this end, the Service Contract Act commands:

> The contract and bid specification shall contain a provision specifying the fringe benefits to be provided to each class of service employee engaged in the performance of the contract or any subcontract, as determined by the Secretary [of Labor] to be prevailing in the locality, or, **where a collective-bargaining agreement covers the service employees, to be provided for under the agreement, including prospective fringe benefit increases provided for in the agreement** …[11]

41 U.S.C. § 6703(2) (emphasis added).

Contrary to the trial Court's decision, CHI did not simply agree in the collective bargaining agreements to make specified hourly contributions toward employee pensions. Rather, it specifically agreed (as part of the collective

[10] The Service Contract Act requires that a contractor must pay its service employees no less than the wages and fringe benefits provided to those employees by a predecessor contractor. 41 U.S.C. § 6707(c). In this case, CHI complied with this requirement by providing its service employees with the same pension plan (i.e., the Local 416 pension plan) that those employees enjoyed while working for the predecessor contractor. After the base period concluded, CHI became its own successor contractor and continued to comply with this requirement of the Service Contract Act by agreeing in subsequent collective bargaining agreements to provide the pension benefits set forth in the Local 416 pension plan. See 29 C.F.R. § 4.163(e).

[11] As detailed above, the solicitation and NASA contract did, in fact, incorporate the 2003-2007 Teamsters collective bargaining agreement and, later, the successor Teamster agreements.

bargaining agreements) to provide employees with the specific retirement benefits set forth in the Teamsters Pension Plan.

In essence, the government, by contract, specifically required CHI to pay the wages and fringe benefits set forth in the Teamsters collective bargaining agreement, while also directing CHI to use the wage rates and fringe benefits set forth in that collective bargaining agreement to price the work, all while also directing CHI not to price any contingencies for future wage and fringe benefit costs.

The command not to price contingencies into the contract is a consequence of the contract's incorporation of the price adjustment clause, which is designed to provide contractors such as CHI with relief in circumstances such as those present in this case. Here, the contract incorporates FAR 52.222-44, which provides that "[t]he contract price or contract unit price labor rates **will be adjusted to reflect increases or decreases by the Contractor in wages and fringe benefits** to the extent that these increases or decreases are made to comply with . . . an increased or decreased wage determination applied to this contract by operation of law[.]"[12] FAR 52.222-44(c) (Feb. 2002) (emphasis added).

---

[12] Similarly, FAR 52.222-43(d)(1) provides, "The contract price or contract unit price labor rates will be adjusted to reflect the Contractor's actual increase or decrease in applicable wages and fringe benefits to the extent that the increase is made to comply with … [t]he Department of Labor wage determination applicable on the anniversary date of the multiple year contract, or at the beginning of the

There can be no question under the facts alleged in this case that CHI experienced an increase in its fringe benefit pension costs as a result of complying with its obligations under the collective bargaining agreements. The agreements contractually obligated CHI to provide the benefits set forth in the Teamsters Pension Plan. To do so, CHI was required to pay both an hourly contribution for each hour worked by its employees and, when that amount was deemed insufficient upon CHI's forced withdrawal from the plan, withdrawal liability to fund the benefits that had already accrued.

This Court's decision in *Lear Siegler Services, Inc. v. Rumsfeld*, 457 F.3d 1262 (Fed. Cir. 2006), is squarely on point. In that case, the court reversed summary judgment in favor of the government and held that the price adjustment clause (FAR 52.222-43) was properly triggered where the contractor experienced an increase in costs associated with providing a defined benefit health insurance plan even though the health benefits themselves did not increase.

In finding the price adjustment warranted, the Court in *Lear Siegler Services* specifically noted the contractor's collective bargaining agreement "required it to provide its employees with a defined-benefit health plan" and that such a plan

---

renewal option period … [or] [a]n increased or decreased wage determination otherwise applied to the contract by operation of law."

"obligates an employer to spend whatever is necessary to continue to provide its employees with an agreed-upon level of benefit." 457 F.3d at 1265.

In support of denying the price adjustment, the government argued that since "there had been no change in the CBA or the scope of benefits to be provided, … the CBA-based wage determination did not require LSI to incur the increased cost of maintaining the defined level of health benefit, and that the Price Adjustment Clause was therefore inapplicable." *Id*. Rejecting this argument, this Court stated:

> In short, the Price Adjustment Clause is triggered by changes in an employer's cost of compliance with the terms of a wage determination. The fact that there has been no nominal change in the mandated benefit – i.e., that there has been no change in the level of benefit provided by the defined-benefit plan – is simply irrelevant.

*Lear Siegler Services*, 457 F.3d at 1269.

Just as in *Lear Siegler Services*, in this case, CHI agreed in the Teamsters collective bargaining agreements to provide specific pension benefits to its employees (i.e., the pension benefits set forth in the Teamsters Pension Plan). Those pension benefits, by operation of law and by contract, constituted the wage determination mandated by the Service Contract Act. When CHI subsequently experienced an increase in cost to furnish those mandated benefits, the price adjustment clause was triggered and reimbursement was required. The government's failure to provide the requested price adjustment to reimburse CHI for all of its increased costs incurred in providing the pension benefits, including

the withdrawal liability, constitutes a breach of contract. As such, the decision dismissing CHI's Complaint in this case should be reversed.

### B. Pension withdraw liability constitutes the cost of providing the employer's portion of employee pension benefits which accrued prior to the employer's withdrawal.

The government and the trial Court attempt to circumvent the requirement to provide a price adjustment for CHI's increased costs of providing the mandated pension benefits by characterizing CHI's withdrawal liability as statutory liability and by contending that withdrawal liability is not, by itself, a fringe benefit. Although there can be no doubt that the withdrawal liability is mandated by statute, that fact does not alter the conclusion that withdrawal liability constitutes the employer's cost of paying for pension benefits which have already accrued as of the date of the employer's withdrawal from the pension plan. In that respect, there is no practical difference between ongoing hourly pension contributions used to fund the cost of required pension benefits during the period in which the employer is participating in the plan, and withdrawal liability used to fund those same benefits which have already accrued when the employer withdraws from the plan.

The fact that withdrawal liability is a cost associated with providing specific accrued pension benefits, and not just an unattached statutory debt, is well established. To this end, the MPPAA was specifically enacted in 1980 to provide a mechanism requiring multiemployer pension plans to sufficiently fund promised

employee pension benefits where, as here, a participating employer withdraws from the plan. *Pension Ben. Guar. Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 725, 104 S. Ct. 2709, 81 L. Ed. 2d 601 (1984). As the Supreme Court recognized shortly after the MPPAA's enactment, the MPPAA "requires that an employer withdrawing from a multiemployer pension plan pay a fixed and certain debt to the pension plan." *Id*. "This withdrawal liability **is the employer's proportionate share of the plan's 'unfunded vested benefits**,'…." *Id*. (quoting 29 U.S.C. §§ 1381, 1391) (Emphasis added).

The Supreme Court has further emphasized that "[i]t was also **plain enough** that the purpose of imposing withdrawal liability was to ensure that employees would receive the benefits promised them." *Connolly v. Pension Ben. Guar. Corp.*, 475 U.S. 211, 227, 106 S. Ct. 1018, 89 L. Ed. 2d 166 (1986) (Emphasis added); *see also Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California*, 508 U.S. 602, 605 (1993) ("A pension plan like the one in issue, to which more than one employer contributes, is characteristically maintained to fulfill the terms of collective bargaining agreements."). Moreover, "[t]he assessment of withdrawal liability is not made in a vacuum, however, but directly depends on the relationship between the employer and the plan to which it had made contributions." *Connolly*, 475 U.S. at 225.

In the present case, the Court of Federal Claims correctly determined that "there exists a contractual requirement that defendant reimburse claimant for contributions to and costs associated with the pension plan[.]" (Appx6). However, the Court determined that this contractual requirement did not extend to withdrawal liability because, in its view, withdrawal liability is not a fringe benefit but is instead a "statutory debt" under the MPPAA. (Appx6-7). The Court's rationale in this regard is misplaced.

The fringe benefits at issue in this case are the specific pension benefits set forth in the Teamsters Pension Plan and promised to employees by virtue of the relevant collective bargaining agreements. While the actual withdrawal liability payments made by CHI to the Pension Plan are not fringe benefits in a strict sense, neither were the hourly pension contribution payments made by CHI to the Pension Plan to fund the pension benefits. Rather, both the hourly contribution cost and the withdrawal liability cost incurred by CHI are the costs to fund the fringe benefits. In this case, the fringe benefits are the pension benefits promised to employees in the Teamsters Pension Plan.

Likewise, the fact that the withdrawal liability is mandated by statute is also not dispositive of the issues in this case. Neither the price adjustment clause nor the Service Contract Act contain any exclusion for the costs of providing a fringe benefit that is simultaneously mandated by statute and by contract. Indeed, the

hourly pension contributions required of CHI by the Teamsters collective bargaining agreements are likewise mandated by ERISA, just the same as is the withdrawal liability. 29 U.S.C. § 1145 ("Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement."); 29 U.S.C. § 1132 (g)(2) (providing a statutory cause of action to sue employers who fail to make required contributions to a multiemployer pension plan).[13]

Neither party seriously disputes that the Service Contract Act and the price adjustment clause required the government to reimburse CHI for the increased hourly pension contributions that were assessed when the Pension Plan became underfunded. The fact that CHI was later forced to withdraw from the plan, resulting in the acceleration of CHI's costs to fund that pension liability in the form of withdrawal liability, does not change the character of those costs as another cost

[13] Further militating against interpreting the price adjustment clause to exclude the costs of a wage or fringe benefit simply because it is mandated by statute is the simple fact that there are a number of instances where specific wages or fringe benefits are subject to the Service Contract Act despite being simultaneously required by statute. These include, for example, the payment of federal or state minimum wages or payments for mandatory paid leave as required by some states and now by the federal government. See e.g., Executive Order 13706 (requiring federal contractors to provide paid sick leave to its employees).

of paying for mandated, accrued pension benefits. Consistent with this Court's decision in *Lear Siegler Services*, a price adjustment is required to reimburse CHI for the increased costs associated with providing the pension benefits set forth in the Teamster collective bargaining agreements.

### C. By prohibiting CHI from including contingencies to cover unanticipated future pension cost increases, while also denying CHI reimbursement when such increases arise, NASA has denied CHI the very benefit for which the price adjustment clause was included in the contract.

Notably, it cannot be overemphasized that the solicitation in this case specifically directed CHI not to include any contingencies for potential future increased costs associated with providing the required wage or fringe benefits. FAR 52.222-44(b) ("The Contractor warrants that the prices in this contract do not include any allowance for any contingency to cover increased costs for which adjustment is provided under this clause."). Following this directive, CHI priced the contract pursuant to the costs of providing the pension benefits which existed at the time.

Once CHI's costs of providing the mandated pension benefits increased in 2008 and again in 2012, CHI submitted, and was given, a price adjustment. Notwithstanding, when CHI was required to withdraw from the Teamsters Pension Plan as a result of the employees' decision to decertify the Teamsters as its representative (in favor of a rival union), NASA refused to grant a further price

adjustment when the Teamsters Pension Plan accelerated payment for the then-accrued pension benefits.

As *Lear Siegler Services* makes clear, the price adjustment clause is designed for just this type of contingency. In 2003, CHI did not know (and indeed could not have known) that the cost of providing the pension benefits in the Teamsters Pension Plan would dramatically increase or that the plan would reach critical status years later. Rather than price contingencies for such possibilities in the contract, contractors are directed by the price adjustment clause to forego such action based on the promise that a pricing adjustment will be provided should costs to provide the benefit unexpectedly increase. That's precisely what occurred in this case. NASA should have provided CHI with a price adjustment not only for its increased hourly contributions in 2008 and 2012, which were associated with the cost of furnishing the mandated pension benefit, but also the withdrawal liability subsequently assessed, which was likewise CHI's cost of furnishing the mandated pension benefit.

Accepting the trial Court's and the government's interpretation of the price adjustment clause would necessarily mean that the government either (1) expects contractors to price a contingency for potential future withdrawal liability into its bids (thereby dramatically increasing the costs of all bids, even where subsequent withdrawal liability never materializes); or, (2) expects contractors to shoulder any

increases in the cost of providing fringe benefits even where those fringe benefits are required by the government.[14] The government cannot have it both ways – requiring that the contractor provide certain fringe benefits while also precluding the contractor from either pricing that benefit or from obtaining reimbursement through the price adjustment clause.

While the trial Court correctly noted that "[t]he purpose of the Service Contract Act is to protect employees, not contractors, from suffering financial disadvantage when a successor contractor undertakes workforce management" (Appx6), this Court's decision in *Lear Siegler Services* makes it equally clear that the purpose of the price adjustment clause is to protect the contractor when the required wages and fringe benefits result in an increase in costs, as is the case here.

---

[14] The government, in its Motion to Dismiss, contended that while the price adjustment clause does require the government to reimburse for pension "contributions" made by CHI toward mandated employee pension benefits, that rationale is inapplicable to withdrawal liability owed for providing those same benefits. The government's argument, taken to its logical end, would mean that the price adjustment clause would have provided for reimbursement had CHI simply negotiated with the Teamsters to include in its collective bargaining agreement a pension contribution by CHI of the entire unfunded pension liability (as opposed to incorporating an orderly schedule of contributions over time as provided in the MPPAA). There can be no doubt that, had CHI negotiated an increased pension contribution of $1.686 million dollars to the Teamsters to provide for the funding of the mandated pension benefits, the government would have rejected a price adjustment to cover that contribution. In any event, such a scenario illustrates the lack of any appreciable difference between a monthly contribution toward vested pension benefits on one hand and lump sum withdrawal liability imposed to pay for those same vested pension benefits on the other hand.

457 F.3d at 1268 (Holding that the price adjustment clause addresses "the effect on the Contractor, which logically can only refer to changes in cost.").

## CONCLUSION

As detailed above, the price adjustment clause mandates that the government reimburse CHI for the increased costs it experienced in providing the pension benefits required by the Teamsters collective bargaining agreements. As the pension withdrawal liability incurred by CHI in this case constitutes a cost of providing the accrued pension benefits mandated by the Service Contract Act, the government's denial of a price adjustment constitutes a breach of contract. The decision of the Court of Federal Claims holding otherwise and dismissing CHI's Complaint with prejudice should therefore be reversed.

WHEREFORE, for the reasons set forth above, Call Henry, Inc., respectfully requests that this Court reverse the decision of the Court of Federal Claims dismissing the Complaint.

Respectfully Submitted,

/s/ Brian Koji

Brian Koji
Florida Bar No. 0116297
bkoji@anblaw.com
ALLEN, NORTON & BLUE, P.A.
324 S. Hyde Park Avenue, Suite 225
Tampa, Florida 33606
Tel.: 813-251-1210
Fax: 813-253-2006
Attorneys for Call Henry, Inc.

# ADDENDUM

# In the United States Court of Federal Claims

**No. 14-989 C**

**CALL HENRY, INC.**

**JUDGMENT**

**v.**

**THE UNITED STATES**

Pursuant to the court's Opinion and Order, filed February 17, 2016, granting defendant's motion to dismiss,

IT IS ORDERED AND ADJUDGED this date, pursuant to Rule 58, that plaintiff's complaint is dismissed.

Hazel C. Keahey
Clerk of Court

**February 22, 2016** By: s/ Debra L. Samler

Deputy Clerk

NOTE: As to appeal, 60 days from this date, see RCFC 58.1, re number of copies and listing of all plaintiffs. Filing fee is $505.00.

# United States Court of Federal Claims

No. 14-989 C

| | | |
|---|---|---|
| CALL HENRY, INC., Plaintiffs, | ) | |
| v. | ) | RCFC 12(b)(6); Failure to State a Claim |
| THE UNITED STATES, Defendant. | ) | |

*Brian Koji*, Allen, Norton & Blue, P.A., Tampa, Florida, for plaintiff.

*James T. Mahoney*, National Aeronautics and Space Administration, Washington, DC, and *Joyce R. Branda* and *Robert M. Norway*, United States Department of Justice, Civil Division, Washington, DC, for defendant.

## OPINION AND ORDER

***SMITH*, Senior Judge**

This action is before the court on defendant's motion to dismiss. Plaintiff's complaint contests a final decision of the Contracting Officer of the United States National Aeronautics and Space Administration ("NASA") denying Call Henry, Inc.'s (CHI) certified request for reimbursement in the amount of $1,897,627 plus associated fees and costs under the contract and by operation of the Services Contract Act, 41 U.S.C. §§ 6701-6707.

On January 28, 2015, defendant filed a motion to dismiss plaintiff's breach of contract claim for failure to state a claim, pursuant to Rule 12(b)(6) of the Rules of the U.S. Court of Federal Claims ("RCFC"). For the following reason, the court grants defendant's motion to dismiss.

# I. Background

## A. Factual History

On April 23, 2003, Plaintiff, Call Henry, Inc., entered into a contract with Defendant, the National Aeronautics and Space Administration ("NASA"), whereby plaintiff agreed to provide inspection, maintenance, and testing services for the John H. Glenn Research Center in Brook Park, Ohio. This contract has a base period of three years followed by up to seven one-year option periods and is a services contract governed by the Service Contract Act.

At the commencement of the contract, plaintiff's employees were members of the International Brotherhood of Teamsters Local Union No. 416 ("the Teamsters"), and, as such, plaintiff was subject to a collective bargaining agreement with the Teamsters pursuant to the Services Contract Act. 41 U.S.C. § 6701 *et seq.* (2012). This collective bargaining agreement, which included wage and fringe benefit provisions, was incorporated into plaintiff's contract with defendant. Compl. ¶ 20. Article XXIII of the collective bargaining agreement required plaintiff to pay contributions to the Teamsters' pension fund as follows:

> Effective January 1, 2003 and thereafter, the Employer agrees to pay into the Teamsters Local 416's Pension Fund…the agreed amount during the term of this Agreement, for all hours for which said employee received pay, but not to exceed a total of forty (40) hours per week, for each employee covered under the classifications of this agreement.
>
> …
>
> Contributions to the Pension Fund must be made for each month on each eligible employee. Company contributions to the Pension Fund will in no way be distributed as wages.

Compl. Ex. 1, at 2. Pursuant to the SCA, this collective bargaining agreement was incorporated into the contract between the parties, along with a price adjustment clause which required Defendant to pay Plaintiff for "increase[s]…in applicable wages and fringe benefits to the extent that the increase is made to comply…as a result of [the] Department of Labor wage determination applicable of the anniversary date of the multiple year contract…." 48 CFR § 52.222-43[1].

In 2012, Plaintiff's employees chose to decertify Teamsters as the representative for the bargaining unit and voted for the International Association of Machinists and

[1] The contract initially referenced 48 CFR § 52.222-44, which deals with single-year contracts. Both parties acknowledged that the intended provision was 48 CFR § 52.222-43, which deals with multiyear and option contracts.

Aerospace Workers District Lodge 60 as the new employee representative. After the decertification, plaintiff was informed that it was deemed to have withdrawn from the Teamsters' pension fund pursuant to the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). 29 U.S.C. § 1381 *et seq*. (2012). This constituted a complete withdrawal under the Employee Retirement Income Security Act ("ERISA"), and plaintiff was required to pay a withdrawal liability for the unfunded vested benefits, which initially amounted to $3,304,727. Plaintiff initiated ERISA arbitration procedures to contest portions of the liability, and the pension plan recalculated the withdrawal liability amount as totaling $1,686,646.

Plaintiff submitted a claim for increased costs associated with providing the pension plan and the professional costs incurred through arbitration. The claim was denied by NASA on September 11, 2014, and plaintiff filed this claim for breach of contract on October 15, 2014.

### B. Procedural History

Plaintiff originally filed suit on October, 15, 2014, contesting a final decision of the Contracting Officer of NASA, denying plaintiff's claim for reimbursement in the amount of $1,897,627 under the Contract's price adjustment clause for increased fringe benefit costs incurred by plaintiff and associated with providing benefits mandated by application of a wage determination by operation of the Service Contract Act, 41 USC §§6701-6707. See Original Compl., *Call Henry, Inc.*, No. 14-989, ECF No. 1. On January 28, 2015, defendant, filed a motion to dismiss for failure to state a claim, alleging that plaintiff's withdrawal liability is not a fringe benefit, but a statutory liability. *Call Henry, Inc.*, No. 14-989, ECF No. 8.

On July 7, 2015, this Court issued an order for supplemental briefing so that both plaintiff and defendant might answer the following questions:

1. Whether the defendant was required by contract between itself and plaintiff, or by some other authority, to reimburse plaintiff for any contributions to or costs associated with the pension plan, and, if so, the source of that authority.

2. If there was a reimbursement requirement, whether that requirement was incorporated into the contract between plaintiff and defendant.

3. Whether the defendant is considered an employer under 29 U.S.C. § 1002(5), where an employer is any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan.

4. If the defendant reimbursed plaintiff for any contributions to or costs associated with the pension plan, whether defendant is considered an employer and is liable to the plan for the amount of the withdrawal liability pursuant to 29 U.S.C. § 1381(a).

5. If defendant is considered an employer and it is required to pay the withdrawal liability, whether a failure to pay would constitute a breach of its contract with plaintiff.

*Call Henry, Inc.*, No. 14-989, ECF No. 13. Both plaintiff and defendant filed opening supplemental briefs on November 9, 2015. *Call Henry, Inc.*, No. 14-989, ECF Nos. 18 and 19. Plaintiff and Defendant both responded to each other's opening supplemental briefs on November 23, 2015. *Call Henry, Inc.*, No. 14-989, ECF Nos. 20 and 21. Defendant's motion is now ripe for review.

## II. Discussion

Motions to dismiss under RCFC Rule 12(b)(6) test the legal sufficiency of a complaint in light of RCFC Rule 8(a), which requires "a plausible 'short and plain' statement of the plaintiff's claim, showing that the plaintiff is entitled to relief." *K-Tech Telecommunications, Inc. v. Time Warner Cable, Inc.*, 714 F.3d 1277, 1282 (Fed. Cir. 2013) (quoting *Skinner v. Switzer*, 131 S. Ct. 1289, 1291 (2011)). Although a complaint "does not need detailed factual allegations," the plaintiff must plead enough factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). When considering a motion to dismiss for failure to state a claim, the court must accept plaintiff's factual allegations as true and draw all reasonable inferences in favor of the plaintiff. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). Nonetheless, the court should dismiss a complaint "when the facts asserted by [the] claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002).

### A. The Contract Obligations

As an initial matter, it is important to determine whether or not NASA had a contractual obligation to reimburse CHI for contributions to or costs associated with the pension plan. Plaintiff argues that the contract specifically incorporated the Teamsters Local 416 collective bargaining agreement as the applicable wage determinations. The clause plaintiff refers to (H.6) states, in pertinent part, that "in absence of the [Department of Labor Wage Determination's] incorporation, all economic provisions, *including all prospective increases*, of the current Collective Bargaining Agreement…shall apply." (Emphasis added). Plaintiff further argues that a reimbursement requirement is inherent in the incorporation of Clause 52.222-41 of the Services Contract Act, which states that "[e]ach employee employed in the performance of this contract by the Contractor or any subcontractor shall be paid not less than the minimum monetary wages and shall be furnished fringe benefits in accordance with the wages and fringe benefits determined by the Secretary of Labor, or authorized representative, as specified in any wage determination attached to this contract." FAR 52.222-41(c) (May 1989). Finally, plaintiff argues for the reimbursement requirement by

pointing to the incorporation of the price adjustment clause set forth in FAR 52.222-44, which requires reimbursement for any increases incurred by CHI associated with providing wage and fringe benefits mandated by the Services Contract Act. Pl.'s Opening Brief. *Call Henry, Inc.*, No. 14-989, ECF Nos. 18.

While we agree that the contract incorporated both a price adjustment clause and wage determination clause, plaintiff has misconstrued the language and intent of the Services Contract Act. The purpose of the Services Contract Act is to protect employees, not contractors, from suffering financial disadvantage when a successor contractor undertakes workforce management. *See American Fed'n of Labor & Congress of Indus. Org. v. Donovan*, 757 F.2d 330, 352 (D.C. Cir. 1985)). Furthermore, the previously mentioned contractual provisions suggest that the Services Contract Act requires successor contractors to provide the same economic provisions of either Department of Labor wage determinations or existing collective bargaining agreements. *See, e.g., Trinity Servs., Inc. v. Marshall*, 593 F.2d 1250, 1257-58 (D.C. Cir. 1978). Only the *economic provisions*, specifically wage determinations and fringe benefits, of the collective bargaining agreement are incorporated into the contract between CHI and NASA. The Services Contract Act does not incorporate the terms of a collective bargaining agreement into a Government contract, but merely mandates that a successor contractor pay an employee no "less than the wages and fringe benefits [that] the service employee would have received under the predecessor contract, including accrued wages and fringe benefits and any prospective increases in wages and fringe benefits provided for in the collective-bargaining agreement as a result of arm's-length negotiations." 41 U.S.C. § 6707(c)(1). Furthermore, wage determination clauses and the Services Contract Act do not "require successor contractors to comply with any provision of the predecessor's [collective bargaining agreement] other than the wage and fringe benefit provisions." *Systems Application & Techs., Inc. v. United States*, 100 Fed.Cl. 687, 717 (2011) (Sweeney, J) (citing 29 C.F.R. § 4.163(a) (2009)).

**B. Reimbursement Requirement**

Plaintiff contends that the history of price adjustment combined with the initial inclusion of wage and fringe benefit costs into the original pricing schedule effectively require NASA to reimburse CHI for the withdrawal liability that triggered when CHI employees withdrew from the Teamsters Local Union 416. This court does not agree. Though there exists a contractual requirement that defendant reimburse claimant for contributions to and costs associated with the pension plan, that requirement does not extend to withdrawal liability.

Even if the inclusion of provisions from the collective bargaining agreement effected an incorporation of a reimbursement requirement, it would not follow that defendant is required to pay the withdrawal liability. CHI bases its theory of relief on incorrect assumption that withdrawal liability is included as the fringe benefit of

increased pension costs. Compl., *Call Henry, Inc.*, No. 14-989, ECF No. 1, at 9. Withdrawal liability is not a fringe benefit. The Services Contract Act specifically states that "[n]o benefit required by any other Federal law…is a fringe benefit for the purpose of the [Services Contract Act]." 29 C.F.R. § 4.171(c). Instead, withdrawal liability is covered under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 *et seq*., which means that it is a "benefit required by [another] Federal law" and not a fringe benefit. 29 C.F.R. § 4.171(c). Additionally, withdrawal liability is not a contractual obligation, but a distinct statutory debt imposed by the MPPAA. *See e.g., Einhorn v. Dublin Bros. Lumber Co., Inc.*, 33 F. Supp. 3d 504, 516 (D.N.J. 2014). The Teamsters Collective Bargaining Agreement provides for contributions to the pension plan, but does not mention withdrawal liability. It follows that withdrawal liability is not a fringe benefit provided for in the contract.

**C. Employer Status under 29 U.S.C. § 1002(5)**

In response to defendant's motion to dismiss, this court deemed of import whether or not defendant could be classified as an "employer" for the purpose of the Employee Retirement Income Security Act of 1974 (ERISA). In an Order dated July 7, 2015, this court sought additional briefing from the parties so that it might determine whether NASA is considered an employer under 29 U.S.C. § 1002(5) for the purpose of withdrawal liability. Supplemental briefs have been provided, and that question is now ready for decision.

Title I of ERISA defines an "employer" as "any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5). Title I of ERISA further defines a "person" as "an individual, partnership, joint venture, corporation, mutual company, joint-stock company, trust, estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9). The Federal Government is excluded from both of these definitions.

Additionally, Title I of ERISA specifically excluded the Federal Government from the definition of "employer" for the purpose of employee benefit plans by providing a separate definition for "governmental plan." The term "governmental plan" is defined as "a plan established or maintained for its employees by the Government of the United States, by the government of any State or political subdivision thereof, or by any agency or instrumentality of any of the foregoing." 29 U.S.C. § 1002(33). ERISA was designed such that plans offered by the Federal Government are separate from other plans and, thus, exempt from the general definition of "employer" for the purpose of general plans. The Supreme Court noted that "[j]ust as Congress' choice of words is presumed to be deliberate, so too are its structural choices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2529 (2013) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.A. 167, 177 (2009)).

### D. Employer Status under 29 U.S.C. § 1381(a)

Title IV of ERISA incorporates the definition of "employer" from Title I by regulation. As a result, courts have routinely adopted a "contributing obligor" definition of the term "employer" for the purposes of Title IV and withdrawal liability. Both plaintiff and defendant attempt to do the same in this case.

In determining whether defendant is an employer for withdrawal liability purposes under Title IV of ERISA, both parties seek to apply the same standard in varying ways to the determination of whether NASA is an employer for the sake of withdrawal liability. They seek to apply the "contributing obligator" standard first articulated in *Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund*, 880 F.2d 1531 (2d Cir. 1989)(*Korea Shipping Corp.*). The court in *Korea Shipping Corp.* defined an "employer" as "a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants." *Id*. at 1537 (quoting *Korea Shipping Corp. v. New York Shipping Ass'n-Int'l Longshoremen's Ass'n Pension Trust Fund*, 663 F. Supp. 766, 770 (S.D.N.Y. 1987)). Rejecting the common law definition of "employer," *Korea Shipping Corp.* ultimately defined "employer" for the purposes of withdrawal liability as "one obligated to contribute to a plan for the benefit of the plan's participants." *Id*. This standard was subsequently adopted by other Federal Circuits. *See Resilient Floor Covering Pension Fund v. M&M Installation, Inc.*, 630 F.3d 848 (9th Cir. 2010); *Carrier Container Council, Inc. v. Mobile S.S. Ass'n Inc.-Int'l Longshoreman's Ass'n. AFL-CIO Pension Plan*, 896 F.2d 1330 (11th Cir. 1990); *Seaway Port Authority v. Duluth-Superior ILA Marine Ass'n Restated Pension Plan*, 920 F.2d 503 (8th Cir. 1990).

Plaintiff contends that NASA should be classified as an employer based on the standard set forth in *Korea Shipping Corp*. Plaintiff bases this contention on the incorporation of the economic provisions of the collective bargaining agreement into the initial contract and the subsequent reimbursement for all pension contributions. Pl's Resp. to Def. Opening Supp. Brief, 14-989, ECF No. 20 at 15-16. Likening the case to *Bowers v. Transportation Maritima Mexicana, S.A.*, 901 F.2d 258 (2d Cir. 1990), plaintiff argues that an indirect obligation to contribute to a pension plan classifies a party as an employer for the purpose of withdrawal liability. However, we do not agree. First, *Bowers* is not analogous. In *Bowers*, when the defendant elected to become a member of the New York Shipping Association, it became contractually bound to those bylaws, which included a provision requiring all members be bound by any future collective bargaining agreements between the New York Shipping Association and third-party unions and pension plans. *Id*. at 262-263.

Second, *Seaway Port Authority* applied a stricter definition of employer. 920 F.2d at 506. That court agreed with the court in *H.C. Elliot, Inc. v. Carpenters Pension Trust Fund*, 859 F.2d 808 (9th Cir. 1988), which found that the term "employer" describes a

"signatory employer" when referring to pension plans. *Id.* at 509. *Seaway Port Authority* highlighted the common factual pattern throughout relevant case law that parties subject to withdrawal liability were contractually bound to make pension contributions. *Id.* That is not the case here. Although defendant routinely reimbursed CHI for pension plan contributions, defendant's contractual obligation was for *reimbursement*, not contribution. CHI posits that the incorporation of the collective bargaining agreement into the initial contract with NASA created a contractual obligation to reimburse CHI for increased pension costs. While this obligation for reimbursement does exist, reimbursement and contribution are not the same.

This court must also look to the holding in *Transpersonnel, Inc. v. Roadway Express, Inc.*, 422 F.3d 456 (7th Cir. 2005). *Transpersonnel, Inc.* found that "the nature of the obligation to contribute [is] contractual, and therefore the party 'who is signatory to a contract creating the obligation to contribute is the employer for purposes of establishing withdrawal liability.'" *Id.* at 460 (quoting *Rheem Mfg. Co. v. Cent States, SE & SW Areas Pension Fund*, 63 F.3d 703 (8th Cir. 1995)). The *Transpersonnel, Inc.* court, as well as subsequent courts, expounded upon the holding in *Rheem* in finding that the obligation to *reimburse* for contributions made by the direct employer is not the equivalent of an obligation to contribute to the fund. *Id.* The obligation of reimbursement arises only *after* a contribution has been made. *Id.* *Transpersonnel, Inc.* drew a distinction between the entity that signed the collective bargaining agreement and the separate entity with a contractual reimbursement requirement, and we must apply that distinction here. Thus, even if NASA was under a contractual obligation to reimburse CHI, defendant is still not a "contributing obligor," and, thus, not an employer for the purpose of withdrawal liability.

In order for defendant to be liable for the withdrawal liability, defendant must first be classified as an "employer." 29 U.S.C. § 1381(a) states that "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal or partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liablity." *Id.* As stated above, the United States is not considered an employer under 29 U.S.C. § 1002(5) or 29 U.S.C. § 1381(a). The crux of plaintiff's argument that NASA is required to pay the withdrawal liability is based upon the incorrect classification of NASA as an employer. However, as this court has determined that NASA is not an employer, it follows that defendant is not required to pay the withdrawal liability.

**E. Breach of Contract Claim**

After considering both the defendant's contractual obligations and its status as an employer under both Title I and Title IV of ERISA, it becomes clear that NASA did not breach its contract with CHI for failing to pay the withdrawal liability. As previously stated, CHI bases its theory of relief on incorrect assumption that withdrawal liability is

included as the fringe benefit of increased pension costs. Compl., *Call Henry, Inc.*, No. 14-989, ECF No. 1, at 9. As this and other courts have indicated, withdrawal liability is not a fringe benefit. Instead, withdrawal liability is covered under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 *et seq*., as a "benefit required by [another] Federal law." 29 C.F.R. § 4.171(c). Furthermore, withdrawal liability is not a contractual obligation, but a distinct statutory debt imposed by the MPPAA. *See e.g.*, *Einhorn v. Dublin Bros. Lumber Co., Inc.*, 33 F. Supp. 3d 504, 516 (D.N.J. 2014). The Teamsters Collective Bargaining Agreement provides for contributions to the pension plan, but does not mention withdrawal liability. It follows that withdrawal liability is not a fringe benefit provided for in the contract, and, thus, the contract has not been breached.

Furthermore, In order for defendant to be liable for the withdrawal liability, defendant must first be classified as an "employer" under either Title I or Title IV of ERISA. Title I of ERISA specifically excluded the Federal Government from the definition of "employer" for the purpose of employee benefit plans by providing a separate definition for "governmental plan." For Title IV, courts have looked to *Korea Shipping Corp.*, which defines an "employer" as "one obligated to contribute to a plan for the benefit of the plan's participants." 663 F. Supp. at 770. Courts have routinely drawn a distinction between an obligation to reimburse and an obligation to contribute to pension plans. *Transpersonnel, Inc.*, 422 F.3d at 460. While NASA is obligated to reimburse CHI for contributions to the pension fund, defendant is not directly obligated to contribute to that fund. Thus, NASA is not obligated to pay the withdrawal liability CHI accrued when its employees withdrew from that fund. The failure to pay the withdrawal liability has not resulted in a breach of contract.

## III. Conclusion

For the reasons set forth above, defendant's MOTION to dismiss is **GRANTED.**

**IT IS SO ORDERED.**

s/ Loren A. Smith
LOREN A. SMITH
Senior Judge

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on June 24, 2016, a true and correct copy of the foregoing was electronically filed using the Court's CM/ECF filing system, which will serve a notice of electronic filing by email on the following counsel of record:

Robert M. Norway
Robert.M.Norway@usdoj.gov

James T. Mahoney
James.T.Mahoney@nasa.gov

McAllister A. West
macallister.a.west@nasa.gov

/s/ Brian Koji
Attorney

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(B)

I HEREBY CERTIFY that this brief, which utilizes a proportionally-spaced typeface, complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure as Microsoft Word calculates that it contains 9168 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

/s/ Brian Koji
Attorney